

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

---

*United States Attorney's Office*
*50 Main Street, Suite 1100*
*White Plains, New York 10606*

November 4, 2025

**BY ECF AND EMAIL**

The Honorable Andrew E. Krause
United States Magistrate Judge
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

    Re:    *United States v. Travis Taylor*, 25 Mag. 2653

Dear Judge Krause:

    The Government respectfully submits this letter in advance of a hearing on defendant Travis Taylor's bail application scheduled for November 5, 2025. The defendant is accused of committing serious federal crimes involving guns and drugs. The charges in the Government's complaint entail lengthy mandatory minimum sentences and are supported by strong evidence, including a recorded post-arrest confession. Two of the charged offenses carry a statutory presumption that pre-trial detention is necessary.

    Taking the circumstances of the offense conduct together with the defendant's long history of violent crime and defiance of supervisory authority—indeed, the defendant committed one of his prior felonies while he was incarcerated for another felony—the defendant cannot rebut the statutory presumption in favor of detention. No condition or combination of conditions could reasonably assure the safety of the community were the defendant released, and the defendant's significant sentencing exposure gives him every incentive to flee. Accordingly, the defendant should remain detained pending trial.

**I.    Background**

    At approximately 2:00 p.m. on Wednesday, August 20, 2025, law enforcement officers stopped the defendant in a vehicle near the intersection of West 5th Street and Mundy Lane in Mount Vernon, adjacent to the Mount St. Michael Academy secondary school. Upon searching the defendant's person, law enforcement found a small quantity of crack cocaine, and the defendant was placed under arrest. Shortly thereafter, officers executed a search warrant for the defendant's residence, an apartment he shared with his girlfriend at 130 West 4th Street in Mount Vernon. At the time, the defendant's girlfriend was pregnant with their child. In searching the apartment, police recovered the following items from the bedroom the defendant shared with his partner:

Hon. Andrew E. Krause  Page 2 of 8
November 4, 2025

- a distribution quantity of crack cocaine (approximately 40 grams) in a clear plastic bag, sitting in a closet next to holiday wrapping paper;

- drug dealer paraphernalia, including a scale covered in crack cocaine residue and cutting razors; and

- a Taurus PT 9 mm handgun with 14 rounds of ammunition, which was stored in a decorative pink zippered box under the bed.

Photographs of items recovered during the search are below:






In a subsequent recorded interview, the defendant confirmed that the crack cocaine and the firearm recovered by police were his. With respect to the gun, the defendant claimed he owned the firearm "for protection," stating: "most of these kids out here, just reckless these days." The defendant claimed he had been robbed twice before and explained that he had "problems" with others

in Mount Vernon. In apparent reference to his record of prior felony convictions, the defendant explained that he had "a fear of being robbed because of my history, I can't possess nothing, legally." In other words, the defendant suggested that his status as a convicted felon, which was known to others and which legally barred him from possessing a gun, contributed to his need to own a gun.

On the day he was arrested, the defendant told police he "worked construction." Long-running narcotics investigations in Mount Vernon, however, had by then established that the defendant spent significant time during working hours effecting hand-to-hand sales of crack cocaine. From May through August of 2025, law enforcement conducted physical surveillance of the defendant's residence on multiple days, each time observing activity consistent with narcotics distribution. For example, on June 26, 2025, law enforcement officers recorded the defendant selling crack cocaine to a customer on the front porch of 130 West 4th Street. The sale took place approximately several minutes after 4:50 p.m., in broad daylight:



Several minutes after the transaction captured above, law enforcement approached the customer as he walked away from 130 West 4th Street. The customer promptly discarded the crack cocaine he received from the defendant minutes earlier, which was neatly packaged in small plastic baggies. The narcotics were recovered by law enforcement. E

Even before law enforcement began investigating the defendant for selling crack from his home in May 2025, the police had developed information from at least July 2024 suggesting that the defendant was distributing crack cocaine elsewhere in Mount Vernon, including from his car and at other locations in the city. And the defendant's felony history began far earlier than that. His arrest and conviction record evidences repeated, escalating criminal activity stretching back

more than 20 years. A review of this record reveals two points of particular relevance to the defendant's pretrial detention analysis:

*First*, the defendant has an established history of using firearms not for "protection," but to perpetrate violent crimes. In 2010, the defendant pleaded guilty to burglary in the first degree in violation of N.Y. PENAL LAW § 140.30(4), an element of which is display of a firearm. According to NYPD incident reports from the underlying incident, the defendant and two associates knocked on the front door of a residence and forced themselves inside, at which point the group, including the defendant, brandished handguns at the occupants of the residence while robbing them of electronics, a wallet, and a safe. The defendant was sentenced to a 10-year term of imprisonment for this crime. In 2007, the defendant pleaded guilty to attempted robbery in the second degree in violation of N.Y. PENAL LAW § 140.30(04). Again, the crime involved a firearm. The NYPD incident report states that the defendant displayed a gun and, together with an associate, stole a victim's automobile. The defendant was sentenced to a one-year term of incarceration. Finally, the defendant was arrested in 2003 and charged with first degree robbery (forcible theft armed with a deadly weapon), grand larceny of a motor vehicle, and menacing in the second degree. The defendant was ultimately sentenced to a term of 16 months to four years imprisonment on charges stemming from that incident.

*Second*, in the course of his criminal history, the defendant has demonstrated a persistent inability or unwillingness to abide by law enforcement and court directives. For example, while serving his 10-year sentence for the armed burglary described above, the defendant committed another felony, pleading guilty to promoting prison contraband in the first degree under N.Y. PENAL LAW § 205.25. According to a New York State Police incident report, the defendant was on his way to evening recreation at the Elmira Correctional Facility when he set off a positive alarm. During a resulting strip frisk, correctional officers recovered a sheathed razor blade from the defendant's buttocks. The defendant was sentenced to an indeterminate term of 18 months to three years imprisonment for this felony in 2011. Likewise, the conduct that gave rise to the defendant's attempted robbery conviction in 2007 occurred in December 2006 while the defendant was on conditional release in connection with an earlier felony offense. The robbery was not the only crime the defendant committed during his brief period of conditional release. He separately pled guilty to criminal trespass in the second degree in violation of N.Y. PENAL LAW § 140.15 in December 2006 for conduct that took place the prior month.

On August 21, 2025, the Government charged the defendant by complaint with violations of 21 U.S.C. § 841(a)(1) and (b)(1)(B), 18 U.S.C. § 922(g)(1), and 18 U.S.C. § 924(c)(1)(A)(i). At time of presentment, the defendant consented to detention and has been in federal custody since.

## II.   Applicable Law

In cases in which "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of any other person and the community," pretrial detention of the defendant is necessary. 18 U.S.C. § 3142(e)(1). Courts weigh several factors, set out in statute, to analyze that question: (i) "the nature and circumstances of the offense charged"; (ii) "the weight of the evidence against the person"; (iii) the "history and characteristics

of the person"; and (iv) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

The Government's burden of proof as to risk of flight is a preponderance of the evidence, and the Government must show dangerousness by clear and convincing evidence. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). Although "more than 'preponderance of the evidence,'" clear and convincing evidence demands "less than [a showing] 'beyond a reasonable doubt.'" *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985).

Congress has established a statutory presumption that detention is necessary for defendants charged with certain particularly serious offenses. The defendant in this case is charged with two counts carrying that presumption: *First,* the defendant is charged with an offense under the Controlled Substances Act carrying a maximum term of imprisonment of at least ten years, *i.e.*, distribution of narcotics and possession with intent to distribute in violation of 21 U.S.C. § 841(b)(1)(B), with a maximum term of imprisonment of 40 years. *See* 18 U.S.C. § 3142(e)(3)(A). *Second,* the defendant is charged with possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). *See* 18 U.S.C. § 3142(e)(3)(B).

To overcome the presumption that detention is necessary, the defendant must produce "evidence that he does not pose a danger to the community or a risk of flight." *Mercedes*, 254 F.3d at 436; *see also United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991) ("[A] defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption."). And even if a defendant carries that burden of production, the statutory presumption does not disappear. Instead, it becomes a factor to be weighed and considered like all the others in deciding whether to release the defendant. *Rodriguez*, 950 F.2d at 88.

### III. Discussion

Consistent with the statutory presumption of detention, each and every one of the Section 3142(g) factors counsels against the defendant's release.

#### A. The Offense Conduct Demonstrates that Mr. Taylor is a Danger.

The nature and circumstances of the charged offenses weigh heavily in favor of detention. The defendant was found in possession of a distribution-weight quantity of crack cocaine at the time of his arrest, which followed a period of months in which law enforcement observed him conduct numerous hand-to-hand narcotics transactions in Mount Vernon. The persistent danger crack cocaine poses to communities in the Southern District of New York hardly needs stating. This dangerous illegal drug has been particularly destructive to Mount Vernon communities for decades, and cocaine-involved deaths nationwide exceeded 29,000 in 2023, an 85% increase from 2019.[1]

---

[1] National Institute on Drug Abuse, *Drug Overdose Deaths: Facts and Figures*, https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates#Download (last accessed Nov. 4, 2025).

There is also the matter of the defendant's gun. The defendant unlawfully possessed a firearm and 14-round magazine for, as he expressly put it, his "protection." The handgun was recovered from the same room in which the crack cocaine was found. That the Government has not charged the defendant with brandishing or firing the gun does not mean the defendant was not ready, willing, and able to do so. Indeed, the defendant's record of prior convictions and the circumstances around those crimes confirm that he has used guns to commit violent crimes in the past.

Finally, and of particular relevance to the defendant's bail application, law enforcement's investigation showed that, throughout the summer of 2025, the defendant distributed crack cocaine from an apartment he shared with his pregnant girlfriend. The defendant stored his drugs in the residence and kept his firearm in a decorative pink box in the bedroom he shared with his partner. While conducting surveillance, law enforcement observed the defendant's buyers travel, one after the next, to 130 West 4th Street to purchase crack cocaine from the defendant. Setting aside the generalized dangers to the broader community posed by crack cocaine addiction and all of its attendant social costs, the defendant chose to run his crack distribution operation in a fashion that put a specific group of people in heightened risk of danger from his criminal activity: namely, the people he lived with. This includes everyone who lived in the multifamily building at 130 West 4th Street, and it also includes the defendant's girlfriend, who shared her apartment with him.

### B. The Weight of the Evidence is Strong.

The weight of the Government's evidence against the defendant is extremely strong. Over the course of the summer, the defendant was observed by law enforcement engaging in numerous hand-to-hand sales of crack cocaine. In some cases, these sales were recorded. In multiple instances, the defendant's customers were arrested in possession of crack cocaine sold to them by the defendant minutes earlier and charged by state and local law enforcement. The defendant himself was arrested in possession of narcotics. Law enforcement found a distribution quantity of crack cocaine at his residence along with paraphernalia of distribution, including a crack-covered drug scale and cutting razors. *See United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) ("Possession of equipment to weigh, cut and package drugs is highly probative of a purpose to distribute.") (quoting *United States v. Pugh,* 566 F.2d 626, 628 (8th Cir.1977)). In the same search, law enforcement recovered an unlawfully possessed firearm with 14 rounds of ammunition.

The defendant confessed to owning all of it—the drugs and the gun—in recorded, *Mirandized*, post-arrest statements.

In light of the above, it is difficult to conceive of a credible defense to the Government's drug trafficking and felon-in-possession charges. As to the 924(c) charge, that, too, is strong, particularly in light of the defendant's own explanation for owning the firearm: that it was necessary for his "protection," given his known felon status and his "problems" with others in Mount Vernon. *See, e.g.*, *United States v. Snow*, 462 F.3d 55, 62–63 (2d Cir. 2006) ("[A] drug dealer may be punished under § 924(c)(1)(A) where the charged weapon is readily accessible to protect drugs, drug proceeds, or the drug dealer himself.").

    The consequences for the defendant should he be convicted of all or even some of the charged crimes are severe. The defendant's 924(c) charge carries a mandatory minimum sentence of at least five years (with up to a possibility of life imprisonment) and his narcotics distribution charge carries a mandatory minimum of five years, with a possibility of up to 40 years' imprisonment. *See* 21 U.S.C. § 841(b)(1)(B)(iii) (mandatory minimum of five years' imprisonment for distributing or possessing with the intent to distribute 28 grams or more of a mixture or substance containing cocaine base). By law, those sentences must be served consecutively. *See* 18 U.S.C. § 924(c)(1)(D)(ii). Moreover, any punishment in this case will take into account the defendant's criminal history, further adding to his already-compelling incentives to flee.

### C.    Mr. Taylor's History and Characteristics Show that Detention is Necessary.

    The defendant's history and characteristics strongly favor detention. As summarized above, the defendant's felony record started more than two decades ago and has not abated, notwithstanding significant intervening periods of incarceration. The defendant has proven several times over that he is not a suitable candidate for supervision on release. In 2006, the defendant committed at least two more crimes while on state conditional release. In 2011, the defendant was convicted of felony promotion of contraband while he was incarcerated for a gunpoint home invasion burglary. Even the supervision of correctional officers in a state prison could not prevent the defendant from continuing to commit felonies.

    With that history, and at 39 years of age, the defendant surely understands the consequences of continued involvement in serious federal crimes. Even so, the defendant chose to engage in the dangerous criminal conduct with which he is now charged. There is no basis to conclude that the risk the defendant poses to the safety of others and the community can be meaningfully mitigated by even the conditions of even the most restrictive pretrial release.

### D.    Taylor's Release Would Endanger the Community

    As documented throughout this letter, the defendant presents a substantial danger to others in the community. Congress has attached a presumption of dangerousness to the defendant's crimes for good reason. The defendant possessed a distribution quantity of an exceptionally deadly illegal drug, engaged openly in narcotics distribution activities from a residence he shared with his pregnant girlfriend, and unlawfully possessed a loaded gun because, notwithstanding his status as a convicted felon (in fact, in part *because* of that status), he felt he needed it for "protection." And as explained in Section III.A above, the defendant's conduct put at disproportionate risk some of the people closest to him, particularly his girlfriend, who lived with him in the apartment he used as a homebase for distributing crack cocaine.

### E.    No Bail Package Would be Sufficient.

    The defendant has not proposed to the Government a specific bail package in advance of the November 5 hearing. It is important to note, however, that two measures ordinarily relied upon to structure the terms of pretrial release—namely, some form of home detention/confinement enforced by electronic monitoring, and some form of a bond—would be categorically ineffective in this case.

Hon. Andrew E. Krause                                                                               Page 8 of 8
November 4, 2025

      Even in their most onerous forms, "[h]ome detention and electronic monitoring" operate on the "word" of the defendant that he will be compliant. *United States v. Millan*, 4 F.3d 1038, 1049 (2d Cir. 1993) (cleaned up). As one court has noted, "home confinement, while important, is not enough to prevent someone who is inclined to commit serious criminal acts from continuing down that path." Bond Hearing Tr. at 28, *United States v. Rivera*, 20 Cr. 6 (S.D.N.Y. Mar. 25, 2020). "[E]lectronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology, and . . . monitoring equipment can be rendered inoperative." *United States v. Orena*, 986 F.2d 628, 632 (2d Cir. 1993) (cleaned up). This is a real risk in many cases. Here, however, the defendant would have no need to circumvent or disable monitoring technology to continue committing exactly the same crimes with which he was charged. The defendant has proven that he is capable of operating a crack cocaine distribution operation without leaving his residence, and that he is willing to use even a residence shared with close family members to sell illegal drugs and store illegal guns. If he chose to resume dealing crack cocaine, home detention or incarceration would not impede him.

      With respect to a bond, this measure does nothing meaningful to assure the safety of the community and would do little to assure the defendant's presence in court. Facing lengthy periods of incarceration on charges supported by strong evidence, the defendant has a powerful incentive to flee, as other defendants have in the past. *See, e.g.*, Bail Forfeiture Order, *United States v. Ceglia*, 12 Cr. 876 (S.D.N.Y. Mar. 24, 2015) (ECF No. 160) (bail forfeiture order entered on a $250,000 bond, secured by four properties, and signed by three family members, after defendant cut monitoring bracelet and fled). Moreover, the defendant has already put loved ones in harm's way by distributing narcotics from and storing an illegal gun in a shared residence. It is unlikely, therefore, that the prospect of a bond guarantor's financial liability, even if that person were a close relative, would exert meaningful moral suasion on this defendant or prevent him from fleeing.

* * * *

      The defendant committed serious federal crimes and now faces the likely prospect of a lengthy federal sentence. For the reasons set forth above, there are no conditions that would ensure the safety of others or the defendant's appearance at future proceedings should he be released. The defendant should remain detained pending trial.

                                                                       Respectfully submitted,

                                                                       JAY CLAYTON
                                                                       United States Attorney

                                               By: _____
                                                   John Sarlitto
                                                 Assistant United States Attorney
                                                 (914) 993-1909

cc: Sungso Lee, Esq. (by ECF and Email)